## GRAHAM ET ALS. v. TANKERSLEY.

1. Where a non-resident vendor of land is unable to make title, an averment, in a bill, filed by the vendee, that the vendor "is in very slender circumstances," and unable to respond in damages on her covenant of warranty, is sufficient to authorise the vendee to come into equity, to enjoin the collection of the purchase money.

2. A vendor of land, unless notified of the pendency of a suit, against the vendor for its recovery, and required to defend it, is not concluded by a judgment of eviction therein.

3. Notice to an agent, appointed by the vendor of land, to receive and collect a note, executed for the purchase money, of the pendency of a suit, by a third person, against the vendee for the recovery of the land, is not notice to the vendor.

4. A plaintiff in a cross bill is not allowed to contradict his answer to the original bill : if he has made a mistake as to the facts in his answer, the only mode of correcting it, is by application to the court for leave to amend it, or to file a supplemental answer, and not by the exhibition of a cross bill.

5. It is not error in the chancellor to refuse to decree upon proof, which is not responsive to any of the allegations in the pleadings.

Error to the 3d Chancery District, before the Hon. Anderson Crenshaw, Chancellor.

In this case, the bill was filed by defendant against plaintiff in error, and alleges, that on the 18th day of May, 1836, he purchased of Susanna McNeill, then of Sumter county, in this state, but now of Newton county, Mississippi, the east half of the south east quarter, and fraction C of section twenty, township nineteen, and range two, west, in the district of land subject to sale at Demopolis, at the price of $3,900, for which he gave his two notes of equal amounts, payable at

one and two years, and received from her a deed in *fee simple* : that at the time of the purchase, he supposed the said Susanna had a good right to the land : that both she and Alexander Graham, her brother, who acted as her agent in the negotiation and sale of the land, so represented at the time, although no patent to it had issued, and that in confirmation of the representations made, said Alexander exhibited to him the receiver's certificate to said Susanna for the same : that at this time he had no knowledge or suspicion of an adverse claim to it : that before the last note fell due, he was, for the first time, notified by one Daniel Green, now deceased, that he was claiming said fraction C, and insisting that the patent for it should issue to him, and that he therefore notified Alexander Graham, who was still acting as the agent of said Susanna, of the fact, and received from him the assurance that Green's claim was unfounded, and the said Susanna's was good and indisputable : that in the sale of the land said fraction C was computed at fifty acres, and the price was thirty dollars per acre : that he paid the first note, but refused to pay the second, when it fell due, to the extent of the price to be given for said fraction C, until said Susanna should complete her title to the same : that said Alexander, upon such refusal, again assured him that Green's claim was unfounded, and said Susanna's right unquestionable ; and that confiding in his assurances, both as an individual and as the agent of said Susanna, he paid so much of the said second note as said fraction C was estimated at, by transfer to the said Alexander, with his, complainant's, endorsement thereon, of a note for $1,500, made by James A. Terry, Stephen Register, and John W. Hawthorn, payable to Philip Jones, or bearer, and due the 1st March, 1839 : that it was known said note would have to be sued on, at the time he endorsed it, and it was thought the suit against the makers would prove unavailing ; and the arrangement was made between him and said Alexander, with the understanding that he should not be sued on his endorsement, or be compelled to pay said note, so endorsed, unless said Susanna completed her title to the same : that at the time of this transaction, said Green had actually obtained the patent to said fraction C, but complainant was ignorant of the fact :

that John Graham and Alexander Graham, who became the owners of this note, having sued the makers to insolvency, have sued complainant on his endorsement, and recovered judgment against him : that Green has died, and the title to said fraction C, is now in his heirs at law, by whom he has been evicted by action of ejectment: that he notified Alexander Graham of the pendency of the action of ejectment : that said Susanna is in very slender circumstances, and is unable to pay and satisfy the recovery, were he compelled to resort to the covenants of the deed, &c. : and the improvements he has made on the land are of greater value than the rents and profits, &c.

The bill prays for a temporary and perpetual injunction of the said judgment at law, and general relief.

The defendants severally answered the bill. The answer of Mrs. McNeill admits all the material allegations of the bill. The answer of Alexander Graham, denies his agency for Mrs. McNeill in the sale, and the representations charged to have been made by him ; denies also that the note of Terry, Register and Hawthorn was endorsed to him by complainant, for fraction C, but insists that it was so endorsed in payment of the land sold to complainant by the deceased father of said Alexander ; and admits most of the allegations of the bill. John Graham's answer denies all knowledge, and calls for proof.

John and Alexander Graham subsequently filed their cross bill, which, after reciting the original bill, alleges, that Tankersley, at a sale of the estate of said Daniel Green, deceased, in 1845, purchased said fraction C, at from four to ten dollars per acre, and that, if it should be established by the proof, to the satisfaction of the court, that said note of Terry, Register and Hawthorn was endorsed to Alexander Graham by Tankersley, as alleged in his bill, he should not be allowed a greater deduction on the judgment enjoined, than the amount he had paid at said sale of the estate of Green, &c. Tankersley's answer admits the purchase at four hundred and eighty-six dollars, but insists that the whole judgment should be enjoined. The proof is sufficiently set out in the opinion of the court.

The chancellor rendered a decree dismissing the cross bill,

and perpetually enjoining the judgment at law; all which is
now assigned as error.

Hoit, and Bliss & Baldwin, for plaintiffs in error.

Was the note of Hawthorn, indorsed by Tankersley, given
for, or on account of, the purchase money for fraction C, sold
by Mrs. McNeil to complainant? This (the question of fact
in the case) is affirmed in the bill, and denied in the answers.
To prove the averment, complainant introduces but two wit-
nesses, Hawthorn and Towles.

1. As to Hawthorn: his statement of the entire transac-
tion is improbable in itself; as to the contract of liability on
the indorsement, it is contradicted by the writing; as to his
memory, he is shown to be unreliable—not recollecting even
that he had given two depositions before, instead of one, as
he states—and not remembering any thing as to Houston's
note, turned out at the same time; he is contradicted by his
former depositions, both of which are materially variant from
the present: one of them describing differently the contract;
the other mistaking the fraction and description, and stating
Alexander Graham to have been acting, in receiving the note
of Hawthorn, on his father's account,—as *we* contend was
the fact. The last deposition, too, when his memory was
farthest from the facts, is the most positive. That these for-
mer depositions can be read to contradict the witness, with-
out calling his notice to them, or laying foundation, see Hol-
man's heirs v. Bank of Norfolk, 12 Ala. 369, at p. 409. He
speaks, moreover, from hearsay—the conversations of Tank-
ersley and Green, as to the only important fact in his depo-
sition.

2. As to Towles: he comes before the court in the suspi-
cious attitude of a witness selected to overhear a conversa-
tion: he equivocates as to the purpose which took him to De
Kalb—" Tankersley went to get a bill of sale, and he accom-
panied him," &c. His statement is, moreover, suspicious in
the fact, that he dates the admissions of Graham at a time
when he was litigating the very matter alleged to be con-
fessed, or but shortly after, and just about the time of the
filing of complainant's bill. (See case of Tankersley and
Graham at law, here at a former term, and by agreement, con-

sidered part of the record.) Moreover, no one but the parties and witnesses were present at this conversation. "This is the weakest of all testimony admissible in law," and when at all suspicious, should be discarded. 2 Johns. C. R. 412; 4 Monroe, 239; 2 J. J. Marsh. 64; 1 Marsh. 588; 2 ib. 225; 1 Smedes & M. C. R. 195.

3. This proof, standing unopposed, would scarcely prevail against the denials of the answers; but it is directly contradicted by three witnesses for defendants—Overstreet, Archibald Graham, and Mrs. McNeill. Overstreet's evidence is of the same character, but of greater credibility, than Towles's: he was not called as a witness to listen for evidence; nor is his statement as to the time of admission so improbable.

4. Placing Overstreet as a set-off to Towles, and the complainant's case rests on a single witness, in opposition to the answer: but even that witness stands opposed to A. Graham and Mrs. McNeill, not by a counter-statement as to the same facts, but by other facts, in express inconsistency with them.           :

5. Nor do any corroborating facts exist to support the witness, and overturn the answer: these, to have that effect, must be strong, equivalent to one witness. What are they? First: the note ($1,500) would cover the price of the land at the rate at which all the land sold by Mrs. McNeill went: this, at most, would only show that the note might have been given for that fraction, not that it was: it is inconsistent with, not a proof of, the complainant's pretension: indeed, it is but a part of that pretension. But that note was given at the time, and in connection with another note. See sequel. Secondly: the assumption that Tankersley would not have paid for the land, the title to which was in dispute, and left unpaid the purchase money for that which was not in dispute.—1. This assumption is not even plausible: for it begs the whole question in issue: since the very thing denied is, that there was any portion of the purchase money unpaid, or unprovided for, either of the land sold by Z. Graham, or by Mrs. McNeill. To show the transparent fallacy of this pretence, we beg to state it: It is, that a portion of the purchase money was unpaid; that this was the purchase money for fraction C; and that the way of leaving it unpaid

was, by indorsing over this note, so as to bind himself to pay it---that indorsement showing, by irrefragable evidence, that it was to be paid by him, if the makers did not pay it! But, even if any presumption could be indulged against the written contract implied from the indorsement, it could only be of any force, from the fact that this was the only portion of the purchase money so left unpaid ; but Houston's note (see answers and A. Graham's depositions) was indorsed at the same time, and in the same way; thereby showing that other portions of the purchase money were, in the same manner, left unpaid, by creating a positive liability to pay !---2. So far from showing a reservation of so much of the purchase money, the indorsement of Tankersley's note shows an actual provision for so much of it.---3. But again : whether Tankersley would withhold payment for fraction C, in any manner, would depend on three things :---1. That he was apprised of any defect of title or claim by Green, which is not shown. 2. That, if he was, he feared it, which he says he didn't ; or, if he did fear it, that he was dissatisfied with the warranty he held : and, further, if he was, that the mere setting up of a claim by him would have enabled him legally to withhold payment : as it would not.

6. The defendant's witnesses are to the points : that Graham (A.) paid Mrs. McNeill's money collected from Tankersley to her ; that she never assigned or transferred to A. Graham her claim on Tankersley ; that Mrs. McNeill's notes were paid by Tankersley at different times, and before the transfer of the Hawthorn note : (Archibald Graham does not testify to the payment of the notes of Mrs. McNeill in 1839 : but, supposing the notes due in January, speaks of the payment as the spring after---i. e., spring of 1838. Mrs. McNeill testifies directly against her interest, making herself liable for all of the debt, a large portion of which she was able to pay, having no interest, and testifying with fairness. Mrs. M. does not say G. paid her in negroes.

7. The account Tankersly gives in his bill is altogether impossible and unnatural. The object of the arrangment which he says was agreed, was not only defeated by the means he took to effect it, but they were preposterously inappropriate and injurious. The note was agreed, he says, to

be taken by Green, he knowing it to be insolvent, in substitution of a good note : to be sued, but with no prospect of getting any thing by suit. T. to pay 10 per cent, for this unnecessary trouble and wanton expense ; if the makers paid any thing, though T. was to lose it; and all to while away the time until it could be seen whether Green's claim was good ! If the suit on the note brought nothing, it was a useless expense ; if it did, it was a dead loss ! now, why not postpone suit on Tankersly's own note, until this fact of Green's title could be ascertained : T. holding H's note, with the claim of making what he could not out of it ?

8. The Grahams supported their answer by this consistent course; to the first court after getting the Hawthorn note, *they* sued the makers in their names, or to their use ; and after the return of "no property," they sued again the endorser T. Now, why should *John* Graham have sued ? *He* was no agent of Mrs. McNeil, nor should he be in any way connected with her business.

As to the questions of law, we contend,

I. That if the complainant were entitled to the relief, the whole cause shows that he was not entitled to the relief asked by the bill, nor upon the facts shown in the bill; and the title therefore, must be dismissed ; for,

II. He was entitled only, at most, to a reimbursement of what he had been compelled to expend, and had expended in getting in his title.

1. Where the relation of vendor and vendee existed, the vendee was a trustee for the vendor, and was bound, as in other cases of trust, to act fairly for the *cestui que trust :* to take no advantage to himself from his position or the trust ; especially to make no arrangement behind the back of the vendee, for his own profit. Now,

2. The question is not, whether, *while in possession, he bought in the title* of Green's heirs ; the question is, did he gain any advantage while in possession. He did : he agreed not to defend, but to let judgment go against him by default, long before it could be obtained in due course of law. He retained possession in consequence of this arrangment, until the sale, at which he bought. He bargained for the land ; had the bargain carried into effect by the sale, and bought it

in. But if the land was *not* sold by his procurement, and to give effect to his bargain, he was evicted, if at all, by his own act and assent, and such eviction was no better for him than if he continued in possession. The sale subsequent to his permiting the possession to go from him, was really in pursuance of it ; and he can claim nothing from it.

3. He never was evicted : he agreed with Andrews, the executor of Green, to a constructive delivery of possession; but Andrews, as executor, nor otherwise, so far as appears, had not authority to take or receive possession.

4. Tankersley could not make a secret renunciation of his character as trustee : Mrs. McNeill was entitled to notice : the surrender was a betrayal of the trust : she should have had an opportunity to defend the title, and to protect the possession. Notice to the Grahams, even if proved, was not sufficient : it was *her* title that was attacked : they were not her agents, general or special. A public sale—especially to a non-resident—was no more in effect, than a private sale. As to this last point, see Hill on Trusts, 536.

5. It is the same whether Tankersley were in possession or not, when he bought in the title of Green's heirs, so far as the facts of this case go. This is evident, from the character the vendee bears—that of a trustee : a trustee, being concerned about the trust only for another, cannot avail himself of the position, to the injury of him who puts him into it : it would be a fraud ; and the fraud would be precisely the same in a case where the possession, being given by the vendor, was secretly surrendered by the vendee, without the knowledge of the vendor, and the vendee dealt with the title for his own profit, as where he retained the possession and so dealt : and the case would be stronger, if by the act, bargain and procurement of the vendee, this possession was given up : (e. g. the case of an ordinary trustee secretly resigning his office, &c.) the duties of the trust plainly are, to apprise the *cestui que trust* of whatever imports his interest to know ; and, if he withholds that information, and acts for himself about the trust property, he can get nothing from this breach of trust.

The court will see the absolute necessity of this rule : since in every case, the vendee, by attornment or temporary aban-

donment of the possession, could part with the possession, in ignorance of the vendor, and then buy in the title : then speculate at will on the rights, and at the expense of the interests of the vendor : and thus all the evils of collusion and adverse interests of tenants, which the rule was intended to keep down, would prevail. The rule is, "if a purchaser gets an advantage by being in possession, *or behind the back* of the party interested," "he shall hold it in trust," &c. 4 Dana, 95. The purchase of T. was literally against this rule.

6. If all other points fail, we submit that the court unquestionably erred in not ordering an account for rent, &c., until Tankersley was in possession : these could not be lumped, and the value of the improvements, guessed at by Tankerley, conjectured by the court, and set off against the rents. Besides, for these improvements, Tankersley was entitled to rebatement of rents from Green's heirs, and probably got it : or, if he did not, it was his own fault, and he is amenable, as if he did. Pulliam v. Robinson, 1 Monroe, 330. He was in under our title from 1836 to 1843.

R. H. SMITH, for defendant in error.

1. The note on Register, Terry and Hawthorn, was given and endorsed in lieu of the purchase money, due on fraction C. This appears from the evidence of Hawthorn and of Towles, and from the deposition of Archibald Graham itself, if considered with reference to the bill, and answers : thus, the bill says, the land was bought of Mrs. McNeill, on 18th May, 1846, and the notes for the purchase money were payable in *one and two years ;* and these allegations are admitted by the answers, and proved by Mrs. McNeill's deed. The bill also says, that the note on Register, H. and T., was endorsed on 1st May, 1839. This is also not denied, but is in substance, admitted in the answers. The witness swears that the notes for Z. Graham's land was paid in the latter *part of the summer, or early in the fall after both fell due.* He said the McNeill note was taken to Sumter in the spring after maturity, that is in the *spring of* 1839, and after Alexander's return, he and Mrs. McNeill settled. Now, the note on Register, H. and T., was passed in *the spring of* 1839, and it follows, that it was passed in payment of the McNeill debt,

and not in payment of the Z. Graham's debt, which was paid the previous *summer or fall.* The witness thinks, or concludes to the contrary, but these facts tend to an irresistable conclusion, and against which the witnesses conclusions are nothing.

From the deposition of Mrs. McNeill, it is apparent that she and Alexander Graham had a disagreement about his conduct in the matter ; that Alexander Graham paid her in negroes for the last note. The conclusion from all this is, that she was not content with his taking the note on Register, H. and T. ; that he and John then settled the matter by themselves, taking the note and settling with her.

The deposition of Overstreet is too uncertain, and vague, (if not senseless) to be of any force. It is also in reply to no matter about which he was interrogated ; is suspicious, and is contradicted by Boyd.

The testimony of Hawthorn is in no wise attacked—*no foundation was laid for attacking it,* and there is no discrepancy of importance, in his deposition in this case, and in the one at law. Neither complainant or defendant, insist that the note was endorsed for *fraction G.*

2. The bill and decree *pro confesso* against Mrs. McNeill, establish the non-residence and practical insolvency of Mrs. McNeill, and either are sufficient to entitle us to an injunction. They are sufficiently averred in the bill. Cullum v. Br. Bank, 4 Ala. 21 ; 8 Dana. 164 ; ib. 32 ; Wyatt v. Greer, 4 S. & Port. 318.

3. A cross bill is founded upon a state of facts growing out or connected with the matters involved in the bill, and giving the defendant some right to a cross action. Like every other suit or bill, it must rest upon an allegation, that the matters set up by it are true. Now the cross bill in this case, rest upon what is denied to be true in defendant's answer—the cross bill still sets up that the chief allegation on which its relief depends, and to which all the other allegations are subordinate, are untrue, and prays for certain relief, provided the answers be proven false. The cross bill is loose, vague, and uncertain, in its allegations.

4. The cross bill cannot be sustained, because although it is generally true that a vendee buying a title over his vendor,

shall (by analogy to landlord and tenant) stand as trustee for his vendor, and only be entitled to be reimbursed what he has paid : yet, the relation to subsist must be mutual—here our vendor and those representing her, repelled the idea of the relation and thereby exonerated us from it. 5 Ala. 417; 10 ib. 17 ; 5 ib. 407.

The above doctrine, also, rests upon the policy of forbiding *secret purchases* by vendees, over vendors, and does not apply to cases of public sales. Jones ex'r. v. Lightfoot, 10 Ala. Rep. 17.

CHILTON, J.—1. It is objected, that the bill in this case contains no averments as to the insolvency of Mrs. McNeill, the vendor, to give the court jurisdiction. This objection is not sustained by the record. The bill avers, that she is in very slender circumstances, and unable to respond in damages which the complainant may recover in an action at law upon her covenant of warranty. Besides this, she is charged to reside beyond the jurisdiction of the court. Several decisions of this court, we think, very clearly show, such averments are sufficient to authorize the vendor to come into chancery, to enjoin the collection of the purchase money for land, the title to which is in a stranger. Greggs v. Woodruff, 14 Ala. Rep. 9; Cullum v. Mobile Bank, 4 ib. 2; 8 Dana, 164; 6 ib. 32; Hunter v. O'Neal, 12 Ala. Rep. 37.

Mrs. McNeill admits her inability to respond in damages to the complainant for a failure of title, and she certainly knows more about her own condition as to solvency than her brothers, who testify upon the subject, and who mistake the number of her slaves. Under the facts presented by the record, we think the jurisdiction of the court, so far as it depends upon the inability of the vendor to respond upon her covenant, sufficient to warrant the interposition of the court to prevent the complainant being driven without the state to seek, at most, a doubtful remedy against his vendor.

2. But it is insisted that Tankersley cannot resort to a court of equity to seek relief against the remaining note for the purchase money, because, when sued, he failed to notify his vendor of the pendency of such suit. This position cannot be maintained. In order to conclude Mrs. McNeill by

the judgment which was rendered in favor of the heirs of Green against Tankersley, she must have been notified of the pendency of the suit, and have been required to defend. This not having been done, the judgment of recovery against Tankersley, does not conclude her in any way, and she may make, as against him, any defence which she could have set up in bar of a recovery of the land, and damages from him. It is not, however, pretended that she had any available defence to the action. On the contrary, it is clearly shown that the heirs of Green have the legal title, derived directly by descent through their ancestor, to whom a patent had issued from the government.

3. The notice of the pendency of the suit, given to Alexander Graham, was insufficient to charge Mrs. McNeill. Graham was her agent " to receive and collect the note," but it is very clear, that this gave him no authority to bind her in respect to the defence of a suit brought against her vendee. Were such the law, every attorney who receives a note for collection, would be converted into a general agent of the payee, in respect to all matters connected with its consideration. The authority in this case was conferred for a specific purpose, and limited to a particular object. It cannot be extended beyond that object, so as to embrace matters clearly not within the contemplation of the parties at the time it was conferred. Story on Agency, § 68 to 71; Wallace v. Br. B'k Mobile, 1 Ala. R. 565; Wood v. McCain, 7 ib. 800; Scarborough v. Reynolds, 12 ib. 252.

4. It is insisted, however, that the complainant below was not entitled to relief, because it does not sufficiently appear the note on Register, Terry and Hawthorn, upon which the judgment sought to be enjoined, was rendered, was given in consideration of the land from which the complainant was evicted, but was given for other lands purchased at the same time, from Zachariah Graham. We have carefully examined the testimony, and without incorporating it in this opinion, will state, that it fully sustains the bill, as to the consideration of the indorsement upon the note. In the first place, it is highly improbable the party would fully pay for land to which the title was confessedly doubtful, and risk his indemnity against his non-resident vendor, on her covenant of war-

ranty: and then, Hawthorn positively swears that he was present when Tankersley indorsed the note; that it was done at his house; that Tankersley refused to pay for fraction C, (the land in dispute,) until he should be indemnified against Green's claim. The testimony of this witness is corroborated by Towles, in an important part of it, who proves, that Alexander Graham told him the note was given for fraction C. Add to this the correspondence of the note with the price of the land, and we think the conclusion cannot well be resisted, that the note in controversy was indorsed by Tankersley, in consideration of said fraction C. That in speaking of the note, Tankersley may have stated to the witness, Overstreet, that the same was indorsed for the land he had bought of *the Grahams*, is a declaration which can have little or no weight as proof, when we consider the Grahams had taken part in the negotiation, and that Tankersley may have looked upon Alexander, who, according to his admission in his answer, was present, and exhibited the title papers, and did some of the talking, as the agent of his sister, Mrs. McNeill. Neither do we think the effort successful, to impeach the testimony of Hawthorn, from the fact, that in a previous deposition, he had described the fraction as designated by the letter G, instead of C. His attention was not called to the apparent discrepancy, upon his examination, so as to afford him an opportunity of explaining, and the land is otherwise identified as the same, being the fraction for which Green was asserting an adverse claim.

5. The cross bill in this case was properly dismissed. It is in direct conflict with the answer of the party filing it, and proceeds upon the ground of the truth of the allegations of the bill in respect to the consideration of the indorsement of the note, which the answer denies. The plaintiff in the cross bill cannot be allowed to contradict his answer in the original suit. 3 Dan. Ch. Pr. 1746; Savage v. Carter, 9 Dana, 414; Hudson v. Hudson, 3 Randolph, 117. His answer, which must be considered true as against himself, destroys the equity he asserts by his cross bill. If, however, we were mistaken in this view, the plaintiffs in the cross bill are not entitled to the relief which they seek, in as much as its allegations as to the purchase, or agreement to purchase by Tan-

kersley, of the land to which the title has failed, are denied by the answer, and disproved by Andrews. It may also be added, that we see no reason why the matter set up in the cross bill, may not be insisted on by way of answer. The proper course would have been, if the defendants had mistaken the facts as to the consideration of the indorsement on the note on T. R. and H. for them to have obtained leave to amend, admitting the allegations of the bill, and setting up the supplemental matter, as a reason why the complainant should not enjoin more of the note than would repay him the amount he had given on the purchase of the land from the estate of Green, with the expense of defending the suit, &c. This they failed to do, but litigated with the complainant, some fourteen months, the question, whether the note was given for the land, and doubtless finding, after the proof was taken, that the allegations of the bill were susceptible of proof, and that they must fail in this defence, they exhibit a cross bill, praying to be relieved as to all except the price paid for the land, in the event that Tankersley should succeed in establishing the falsity of their answers. And thus, after trying one defence, and failing, they desire to set up another, entirely the opposite of the first. Willet v. Fayerweather, 1 Bar. S. C. Rep. 72.

It is the settled rule, that when the defendant has mistaken the facts in his original answer, he cannot contravene his admissions otherwise than by moving to correct it, either by amendment or supplemental answer. He cannot do so by cross bill. 2 Dan. Ch. Pr. 916, and authorities cited. The same rule must apply, where he affirms by his cross bill what he denies in his answer.

6. The cross bill being out of the case, there remains no allegation in the pleading, putting in issue the subsequent purchase of the land by Tankersley, and as the rule requires that the decree must be founded on the allegations of the pleadings, as well as the proof, it follows that the chancellor properly disregarded the purchase made by Tankersley after he had filed his bill. See Carneal v. Banks, 10 Wheat. 181; Gregory v. Power, 3 Litt. 339; Carson v. Gibson, 3 Ala. R. 421; McKinley v. Irvine, 13 ib. 681. This view is conclusive of the case. There is no controversy about the fact, that

the title to the land had wholly failed, and that Green's heirs had received it of Tankersley before he filed his bill.   He avers that his improvements made on the land are worth more than the rents, from the time of his purchase up to the issuance of the patent to Green.   This averment is admitted by the default of Mrs. McNeill, and not denied by the other defendants.   Under these circumstances, we think the chancellor correctly enjoined the collection of the note out of the complainant below, and that there was no necessity for a reference, to ascertain the amount of the rents, and value of the improvements.

It is unnecessary to state what would have been our conclusion had the subsequent purchase of the land by Tankersley been properly presented before us.   We are not at all sure, that the defendants have been injured by their failure properly to present it, since they were advised of Green's claim long before the bill was filed, and eight months elapsed after it was filed, before Tankersley, purchased the land. During all this period no steps were taken to perfect his title by the defendants.   But we may not look into these matters.   Let the decree be affirmed.